UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORDSTROM, INC., a Washington corporation; and NIHC, INC., a Colorado corporation, | CASE NO. C12-1853-RSM |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| NOMORERACK RETAIL GROUP, INC., a Canadian corporation; and NOMORERACK.COM, INC., a Delaware corporation, | |
| Defendants. | |

## I.  INTRODUCTION

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. Dkt. # 10.  On February 13, 2013, the Court held a hearing on the matter.  Having reviewed the parties' briefs, oral argument and evidentiary record, Plaintiffs' motion is DENIED.

# II.  BACKGROUND

Since the 1980s, Nordstrom, Inc. and NIHC, Inc. (together, "Nordstrom") has operated the retail concept of Nordstrom Rack.  Nordstrom owns three federally registered trademarks in conjunction with this business (collectively, the "Rack marks"):

1. **RACK®**:  Registration No. 3866811, issued by the U.S. Patent and Trademark Office ("USPTO") on October 26, 2010.

2. **THE RACK®**:  Registration No. 3962979, issued by the USPTO on May 17, 2011.

3. **NORDSTROM RACK®**:  Registration No. 1409938, issued by the USPTO on September 16, 1986.

Nordstrom Rack first opened as a brick and mortar fashion retailer, selling slow moving merchandise from flagship Nordstrom stores at clearance prices.  Dkt. # 10, p. 8.  Nordstrom Rack's business has grown significantly, and now offers a variety of products including beauty, home and electronic goods.  The brand is characterized by high quality goods and services, in large part through its affiliation with Nordstrom.  *Id.* at 9-10.  Customers can also shop Nordstrom Rack online as an extension to its brick and mortar business.  It operates in conjunction with Nordstrom's home website, in which the URL "nordstromrack.com" redirects the user to the Nordstrom Rack section of the site, "http://shop.nordstrom.com/c/nordstrom-rack."  Thomas Dec. ¶ 10.

In 2010, Defendants NoMoreRack Retail Group, Inc. and NoMoreRack.com, Inc. (together, "NoMoreRack") began operating a members-only shopping website that offers steep discounts on clothing, accessories, fragrances, home products, appliances, electronics, software and toys.  Dkt. # 30, p. 8.   NoMoreRack is exclusively an online retail business, which operates under the URL "nomorerack.com."  Ash Dec. ¶ 4.  With a hybrid "flash sale" type business model, customers shop the daily "events" listed on the site, which are deals that last for a limited

1    time.  *Id.* at ¶¶ 3, 8-10.  In addition, NoMoreRack runs a member referral program on its site

2    called "FriendRack."  Since its inception in Vancouver, British Columbia, NoMoreRack's

3    business has grown significantly through its U.S. customer base.  *See id.* at ¶ 23.

4          Nordstrom became aware of NoMoreRack's reach to U.S. customers, and on February 1,

5    2012, it issued NoMoreRack a notice to cease using the Rack marks.  Ferron Dec. ¶ 3.  After

6    failed negotiations, Nordstrom brought Lanham Act claims against NoMoreRack including

7    trademark infringement, unfair competition, dilution, false designation and cybersquatting.  In

8    this action, Nordstrom seeks a preliminary injunction to enjoin NoMoreRack from using its

9    NOMORERACK and FRIENDRACK marks pending the resolution of this case.  Specifically,

10    Nordstrom argues it will likely prevail on the merits of the trademark infringement and dilution

11    by tarnishment claims to its NORDSTROM RACK mark.

12

### III.  THE MARKS

13

| NORDSTROM | NOMORERACK |
|:---:|:---:|
| | |

14



15

16

17

18

19

### IV.  DISCUSSION

20

**A.  Preliminary Injunction Standard**

21          "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

22    *v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008).  Courts must balance the competing

23    claims of injury and consider the effect on each party in granting or denying the injunction.  *Id.*

24

1  The party seeking a preliminary injunction must establish a likelihood of success on the merits, a

2  likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities

3  tips in its favor, and that an injunction is in the public interest.  *Id.* at 20 (citing *Munaf v. Geren*,

4  553 U.S. 674, 689-90 (2008)).  Courts also employ a "sliding scale" approach with respect to the

5  first and third factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir.

6  2011).  Under the continuum, a weaker showing on the merits combined with a stronger

7  demonstration on the balance of equities may warrant preliminary injunctive relief.  The party

8  seeking the injunction need only raise "serious questions going to the merits" but the balance of

9  hardships must tip "sharply" in its favor, assuming the other two factors are met.  *Id.* at 1132.

10 The Court must consider both approaches.

11 **B.  Likelihood of Success on the Merits**

12     1.  Trademark Infringement

13         To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. §

14 1114, a plaintiff must prove: (1) it has a protectable ownership interest in the mark, and (2)

15 defendant's use of the mark is likely to cause consumer confusion.  *Network Automation, Inc. v.*

16 *Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citing *Dep't of Parks &*

17 *Recreation v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).

18         As to the first requirement, NoMoreRack does not dispute Nordstrom's ownership in the

19 Rack marks, as registration raises a rebuttable presumption they are valid and owned by

20 Nordstrom.  Dkt. # 30 at 13 (citing *Safeworks, LLC v. Teupen Am., LLC*, 717 F.Supp.2d 1181,

21 1189 (W.D. Wash. 2010)).  Next, Nordstrom must show that use of the NOMORERACK and

22 FRIENDRACK marks is likely to cause consumer confusion.  Courts look to eight relevant

23 factors as an adaptable proxy: "(1) strength of the mark; (2) proximity of the goods, (3) similarity

24 of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods

1    and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting

2    the mark, and (8) likelihood of expansion of the product lines."  *AMF, Inc. v. Sleekcraft Boats,*

3    599 F.2d 341, 348-49 (9th Cir. 1979).  In certain contexts involving domain names or URLs,

4    courts have used the "Internet troika" approach, in which more emphasis is placed on three of the

5    *Sleekcraft* factors:  (i) similarity of the marks, (ii) relatedness of the goods and services, and (iii)

6    simultaneous use of the Internet as a marketing channel.  *Network Automation*, 638 F.3d at 1146.

7    However, this Court has also found that Internet consumers apply different levels of scrutiny

8    depending on the circumstances, so this approach sheds little light when the inquiry goes beyond

9    domain names and keyword searches.  *Nordstrom, Inc. v. 7525419 Canada, Inc. (dba Beyond the*

10   *Rack)*, No. C12-1387-TSZ, at *13 (W.D. Wash. Dec. 27, 2012) (rejecting the Internet troika

11   approach in a similar case, evaluating Nordstrom's preliminary injunction motion for trademark

12   infringement against a "flash sale" website called Beyond the Rack).  Thus, the Court will not

13   restrict its analysis and will consider all the *Sleekcraft* factors.

14       a.  <u>*Strength of the Mark*</u>

15       The stronger the mark, the greater the protection accorded by trademark laws.  *See*

16   *Sleekcraft*, 599 F.2d at 349.  On the continuum, arbitrary or fanciful marks are the strongest and

17   receive the greatest protection.  *Id.*  Suggestive marks subtly connote something about the

18   product, and while not as strong, may receive protection without acquiring a secondary meaning.

19   *Id.*  Descriptive marks, which tell something about a product, do not receive protection unless a

20   secondary meaning is acquired.  *Survivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th

21   Cir. 2005). Generic marks, which describe the product in its entirety, are not entitled to

22   trademark protection.  *Id.*

23

24

1   In the retail industry, RACK and THE RACK are suggestive marks that are commercially

2   weak, because they occupy a crowded field of similar marks.[1]  *Beyond the Rack*, No. C12-1387-

3   TSZ at *18.  Combined with NORDSTROM, however, the name NORDSTROM RACK is a

4   strong mark that is arbitrary and fanciful in character.  "Nordstrom" is not a common word found

5   in the dictionary.  *See, e.g. Nordstrom Definition*, Dictionary.com,

6   http://dictionary.reference.com/browse/nordstrom (last visited March 1, 2013).  It is rather a

7   Swedish ornamental name composed of the elements nord, meaning "north" and ström, meaning

8   "river."  *E.g. Nordstrom Name Meaning*, Ancestry.co.uk, http://www.ancestry.co.uk/name-

9   origin?surname=nordstrom (last visited March 1, 2013).  The literal translation and meaning of

10  "Nordstrom" or "north river" has no apparent connection to fashion or retail.  Even when

11  combined with "Rack," NORDSTROM RACK retains its arbitrary and fanciful character, with

12  "Nordstrom" being the proper noun and dominant part of the mark.  NORDSTROM RACK's

13  commercial strength is further evidenced by its registration on the USPTO principal register

14  since 1986.  This factor weighs in favor of likelihood of confusion.

15      b.  <u>Proximity of Goods</u>

16  "[T]he more closely related the goods are, the more likely consumers will be confused by

17  similar marks." *Entrepreneur Media v. Smith,* 279 F.3d 1135, 1147 (9th Cir. 2002).  Thus, the

18  _____

19  [1] The *Beyond the Rack* Court denied Nordstrom's preliminary injunction motion,
    focusing on RACK and THE RACK marks standing alone.  In this motion, Nordstrom argues

20  that *Beyond the Rack* misapplied the "crowded field doctrine" to understate the strength of both
    marks.  Dkt. # 37, p. 7.  The Court, however, agrees with the analysis in *Beyond the Rack*.  For

21  the reasons Nordstrom's claim to RACK and THE RACK failed there, the same conclusion
    would result here.  *See Beyond the Rack*, No. C12-1387-TSZ at *13-29.  Nordstrom offers little

22  evidence in this case that RACK or THE RACK is commercially used in isolation without
    referencing the NORDSTROM house mark.  Its examples include phrases in storefronts and

23  advertisements that colloquially reference Nordstrom Rack as "the Rack."  *See* Olsson Dec. ¶¶
    2-15.  However, these materials plainly display the NORDSTROM RACK logo as well.  Thus,

24  only the claim to the NORDSTROM RACK mark will be discussed here.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 6

1    more likely consumers are to make such an association, less similarity is required in finding

2    likelihood of confusion.  *Sleekcraft*, 599 F.2d at 350.  It is not necessary that the products be

3    similar or even competitive if the respective products are related in some manner that could give

4    rise to the mistaken belief they emanate from the same source.  *7-Eleven Inc. v. Wechsler*, 83

5    U.S.P.Q.2d 1715, 1724 (T.T.A.B. 2007).  Thus, this factor requires a flexible approach to the

6    notion of competition, as parties are not required to be direct competitors in order to show

7    likelihood of confusion.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th

8    Cir. 2012).

9         Nordstrom Rack and NoMoreRack are both retailers that offer brand name products at

10   discounted prices.  However, NoMoreRack argues that the goods are not close in proximity,

11   because NoMoreRack sells a wider range of products.  Dkt. # 30 at 19.  It further differentiates

12   Nordstrom Rack customers as high-end shoppers seeking a "department store experience"

13   whereas NoMoreRack's customers expect less from buying online.  *See* Ash Dec. ¶¶ 5-7.

14   NoMoreRack does concede that the two companies at times may offer the same designer

15   clothing brands.  Dkt. # 30 at 19-20.  Aside from the nuances of each business, NoMoreRack

16   fails to explain how its consumer base actually differs, considering Nordstrom Rack also offers

17   its retail services online.  Today, most brick and mortar retailers operate websites as an extension

18   of their business and there is increasingly less differentiation between customers who purchase at

19   a physical store versus those who purchase online.  Further, much of the product categories

20   between the two businesses overlap.  The class of consumers who generally seek these brand

21   name items are likely the same, whether the shopping experience is at a physical store, a standard

22   retail website, or a hybrid flash sale website.  The two businesses do not merely coexist in the

23   same broad industry, but are competitors that offer discounted prices on similar and sometimes

24

identical products.  *See Beyond the Rack*, No. C12-1387-TSZ at *19 (finding that the goods and services of Nordstrom Rack and a "flash sale" website were closely related, because both parties were retailers offering similar products to similar demographics).  Accordingly, this factor weighs in favor of likelihood of confusion, and a "diminished standard of similarity" will be applied in comparing the marks.  *See Sleekcraft*, 599 F.2d at 350.

   *c.  Similarity of the Marks*

   There are three relevant factors in comparing the marks for similarity:  (1) the marks must be considered in their entirety as they appear in the marketplace; (2) similarity is tested in terms of appearance, sound, and meaning; (3) the similarities are weighed more heavily than differences.  *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1206 (9th Cir. 2000).  The proper test is not a side-by-side comparison of the marks, but "whether the marks are sufficiently similar in terms of their commercial impression" such that those who encounter the marks would likely assume a connection.  *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1368 (Fed.Cir. 2012) (citing *Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, 82 U.S.P.Q.2d 1901, 1905 (T.T.A.B. 2007)).  Applying a diminished standard of similarity, the marks are tested for similarity based on appearance, sound and meaning as they appear in the marketplace.

   First, NORDSTROM RACK and NOMORERACK are compared in terms of appearance. NORDSTROM RACK is tiered on two rows of text, with "NORDSTROM" in all capital letters displayed above "RACK" in all lowercase letters.  The text of both words is displayed in a dark grey color.  NOMORERACK is all one word, lowercased, with "NO" and "RACK" colored in dark grey, and "MORE" colored in green.  NOMORERACK also displays a tagline beneath the mark, "Everything you love, for less."  In both cases, "RACK" is all lowercased, using a nearly identical grey font.  This similar characteristic must be considered in light of the marks' overall

appearance.  In some instances, one feature of a mark may be more significant than another and

the dominant feature may be given more weight.  *Leading Jewelers Guild*, 82 U.S.P.Q.2d at

1905.  However, the "RACK" portion of the mark will not be given greater weight in this case.

With NORDSTROM RACK, it is apparent that the housemark "NORDSTROM" is the brand

identifier and dominant feature, despite the fact that RACK is displayed in a larger font.  Since

Nordstrom provides no evidence that "RACK" is commercially used in isolation without

"NORDSTROM," there is no evidence to suggest that the RACK is indeed the dominant feature.

On the other hand, NOMORERACK's dominant feature is "MORE," which is visually

emphasized in a green color.  Thus, even if the similarities in "RACK" are given more weight,

the noticeable differences in the dominant portion of each mark are still apparent.  Taken in its

entirety, the marks are found to be dissimilar in appearance.  *See Coach Services*, 668 F.3d at

1368 (citing *In re Shell Oil Co.*, 992 F.2d 1204, 1206 (Fed.Cir. 1993)).

As to the similarity in sound between NORDSTROM RACK and NOMORERACK,

Nordstrom argues there is phonetic similarity given that both marks contain three syllables, begin

with "NO," and is pronounced with emphasis on the first syllable.  Dkt. # 37 at 6.  NoMoreRack

argues that its name is pronounced with emphasis on the second syllable.  Dkt. # 62 at 9.  As

Nordstrom contends, there is some degree of phonetic similarity present.  However, the overall

pronunciation and spoken sound of "NORDSTROM" and "NOMORE" is fairly different due to

the articulation of distinct consonants in "NORDSTROM."

Even where the marks at issue are identical or nearly identical, differences in connotation

and commercial impressions can outweigh visual and phonetic similarities.  *Coach Services*, 668

F.3d at 1368.  Nordstrom suggests that the "NO" in NOMORERACK can be construed as an

abbreviation of "NORDSTROM," leading to the false impression that NOMORERACK is a

new, online implementation of its existing retail concept.  Dkt. # 37 at 6.  On the other hand, NoMoreRack contends it chose the name to signify that a customer would not need to sift through a large inventory or "rack" to purchase an item, hence "no more rack."  Dkt. # 30 at 9. The Court agrees with NoMoreRack, in that the plain meaning of NOMORERACK suggests it is "not" Nordstrom Rack, and rather a retailer without a physical "rack" to browse on. Nordstrom's interpretation is less convincing, because if indeed "NO" was an abbreviation for "NORDSTROM," it may well be an abbreviation for any retailer beginning with the letters "NO" in conjunction with "RACK."  When "NOMORERACK" is intuitively read as a single phrase, the emphasis is placed on the negative qualifier "NO more rack."  Nordstrom's interpretation uses "MORE" as the qualifier to place emphasis on the alleged Nordstrom's MORE RACK deals.  This association, however, is less intuitive and speaks little to the similarity in meaning between NOMORERACK and NORDSTROM RACK.  The notable distinctions in overall appearance, sound and meaning of the marks outweigh the slight similar characteristics they share.

The comparison of NORDSTROM RACK and FRIENDRACK leads to the same result. As to appearance, the marks share one similarity, which is the font and lowercasing of the word "RACK."  However, FRIENDRACK is all one word, in which "FRIEND" is visually emphasized in a red font.   There is no phonetic or sound similarity between the marks.  As to meaning, Nordstrom argues that consumers are likely to mistake FRIENDRACK as being a referral rewards program for Nordstrom Rack.  Dkt. # 10 at 15.  However, FRIENDRACK is used exclusively in conjunction with NOMORERACK on its website and there is no evidence to suggest that FRIENDRACK is used commercially without reference to NOMORERACK.  Any confusion as to whether FRIENDRACK is a referral program for NORDSTROM RACK is a

step removed and inevitably depends on finding likelihood of confusion between NORDSTROM RACK and NOMORERACK.  Thus, NORDSTROM RACK and FRIENDRACK have distinct commercial impressions.  The notable differences in appearance, sound and meaning offset the slight similarity shared in the "RACK" font.  As to both marks, this weighs against finding a likelihood of confusion.

> ### d.  *Evidence of Actual Confusion*

"Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally."  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (emphasis omitted).   Consistent with this principle, "[e]vidence of actual confusion by consumers is strong evidence of likelihood of confusion."  *Surfvivor,* 406 F.3d at 633.  Non-consumer confusion may also be relevant to the inquiry in three circumstances:  "(1) potential consumers; (2) non-consumers whose confusion could create an inference that consumers are likely to be confused; and (3) non-consumers whose confusion could influence consumers."  *Rearden*, 683 F.3d at 1214.  Proving actual confusion is difficult, and while it is a relevant factor for likelihood of confusion purposes, "its importance is diminished at the preliminary injunction stage of the proceedings."  *Network Automation*, 638 F.3d at 1151.

Nordstrom argues that shoppers have confused Nordstrom Rack as being the source of NoMoreRack's services.  Dkt. # 10 at 25.  To support this claim, Nordstrom provides six instances of actual confusion:

> 1)  A shopper "Katie" contacted Nordstrom's live chat representative with a sizing question for a dress found on NoMoreRack.  Marx Dec., Ex. A.
>
> 2)  A shopper "Stacey" contacted Nordstrom's live chat representative after receiving a wrong order, which was actually purchased from NoMoreRack.  Marx Dec., Ex. B.

1    3)  An anonymous post on "The Nest" website, where a user was confused on
     whether a post about NoMoreRack was referring to Nordstrom Rack.  Silbert
2    Dec., Ex. A.

3    4)  An anonymous post on the "Babycenter" website, where a user was confused
     whether NoMoreRack referred to Nordstrom Rack.  Silbert Dec., Ex. B.

4
     5)  A Twitter post where a user tweeted, "Sign up for Nordstrom's online discount
5    Rack store. . . http://nomorerack.com."  Silbert Dec., Ex. C.

6    6)  An anonymous poster on "NW Bargains" website wrote, "There is yet another
     daily deal site called, NoMoreRack, -[I] guess as in no more Nordstrom Rack!"
7    Silbert Dec., Ex. D.

8         NoMoreRack contends that the examples are "ambiguous, unreliable, minimal and not

9    truly demonstrative of actual confusion."  Dkt. # 30 at 22.  They are rather examples of

10   "misdirected communications" resulting from carelessness and inadvertence, which are not

11   probative of actual consumer confusion.  *Id.* at 23.  The Court agrees that the isolated instances

12   of confusion, particularly those cloaked by anonymity on the Internet, do not rise to the level of

13   actual confusion on a purchasing decision.

14        In the first two instances, the shoppers contacted Nordstrom's customer service to inquire

15   about items on NoMoreRack's site.  "Katie" simply inquired about dress sizing, which is not

16   indicative of a purchasing decision.  "Stacey" spoke to a representative concerning a wrong order

17   purchased through NoMoreRack.  It is not clear whether "Stacey" initially bought the item

18   believing it was Nordstrom Rack's, or whether she simply contacted the wrong customer service

19   line.  As to the remaining examples, statements made in a public Internet forum may be relevant

20   in proliferating confusion among potential customers and to some extent, influencing actual

21

22

23

24

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 12

1  customers.  However, it is unlikely that any serious consumer would be influenced to purchase

2  on NoMoreRack, believing it is Nordstrom Rack, based on an anonymous post.[2]

3          Nonetheless, Nordstrom also provides two examples where direct witnesses were

4  confused about NoMoreRack's affiliation with Nordstrom Rack:

5          1)  Ms. Meister received an email from NoMoreRack, with a picture of a designer
            purse she had seen at Nordstrom Rack stores.  She does not recall ever signing up
6           for NoMoreRack's email subscription because she only purchases from a handful
            of well-known companies online.  Believing the email was from Nordstrom Rack,
7           she clicked on the attached link to enter her billing information for the purse.
            However, the website did not allow her to complete the purchase.  She contacted
8           her daughter, who is Nordstrom Rack's Vice President of Marketing, to inquire
            about the situation.  She was informed that NoMoreRack had no affiliation with
9           Nordstrom Rack.  Meister Dec. ¶¶ 1-10.

10          2)  Mr. Dallman was logging out of his Facebook account when an advertisement
            for NoMoreRack came up on his browser.  He believed it was for Nordstrom
11          Rack because "nomorerack" appeared to combine "Nordstrom" and "Rack."  He
            had to inspect the advertisement several times before determining it was not for
12          Nordstrom Rack.  He then contacted his sister, who is part of the Nordstrom
            Merchandising Group, to inform her about the misleading nature of
13          NoMoreRack's material.  Dallman Dec. ¶¶ 1-4.

14  Mr. Dallman's experience is not telling of actual confusion, because he came to his own

15  realization that NoMoreRack is a different entity from Nordstrom Rack.  As to Ms. Meister's

16  experience, she believed the email was from Nordstrom Rack, because she did not have any

17  reason to think it was another company.  To some extent, this shows a possibility that other users

18  who unknowingly receive emails from NoMoreRack may be under the same impression.  The

19  problem lies in determining whether customers would buy the item because it is from

20  "Nordstrom Rack," or simply because they want the item itself, regardless of the source.  While

21  ─────────────────

22          [2] Internet use is commonplace and the public is generally aware that materials circulating
    online are not reliable unless there is a credible source.  *See, e.g.* Barbara Ortutay, *Many people*
23  *don't trust online information, report finds*, NBC News, Dec. 14, 2011, www.nbcnews.com/
    id/45670764/ns/technology_and_science-tech_and_gadgets/t/many-people-dont-trust-online-
24  information-report-finds/.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 13

1   this evidence of this potential customer confusion is relevant, the Court finds that Nordstrom has

2   not sufficiently demonstrated actual confusion in this case.  For the little weight this factor bears

3   in the overall analysis, it weighs against a likelihood of confusion.

4        *e.* <u>*Marketing Channels Used*</u>

5        Generally, "[c]onvergent marketing channels increase the likelihood of confusion."

6   *Sleekcraft*, 599 F.2d at 353.  This factor becomes less important when the marketing channel is

7   less obscure.  *Network Automation*, 638 F.3d at 1151.  Thus, the shared use of a "ubiquitous

8   marketing channel" like the Internet does not shed much light on likelihood of consumer

9   confusion.  *Id.*  Nordstrom, however, argues that it heavily advertises NORDSTROM RACK

10  products in the "niche marketplace" of social media.  Both Nordstrom and NoMoreRack

11  advertise on their respective Facebook pages, regularly use Twitter to advertise deals, and

12  operate YouTube Channels.  Silbert Dec., Ex. G-L.  It is clear that in the Internet marketing

13  space, both Nordstrom and NoMoreRack operate in the same social media outlets.  However, the

14  Court declines to further define social media as a "niche marketplace" within the broader context

15  of Internet advertising.[3]  This factor is accordingly neutral.

16       *f.* <u>*Type of Goods and the Degree of Purchaser Care*</u>

17       "It is assumed that buyers will exercise greater care in the purchases of expensive goods."

18  *Official Airlines Guides, Inc. v. Goss,* 6 F.3d 1385, 1393 (9th Cir. 1993).  However, the Court

19  cannot focus solely on the price of the items alone.  Today, consumers who use the Internet for

20  shopping are generally sophisticated.  *See Network Automation*, 638 F.3d at 1152-53

21  _____

22      [3] Social media has significantly grown in popularity and is used as a routine vehicle for most Internet marketing strategies today.  *See* David Mielach, *Social Media Marketing Expecting*

23  *a Slowdown*, Business News Daily, Aug. 17, 2012, http://www.businessnewsdaily.com/3019-social-marketing-slowdown.html ("As it currently stands, 88 percent of companies with at least

24  100 employees will use social media and social networks for marketing").

1   (acknowledging that the default degree of consumer care is heightened as online commerce

2   becomes commonplace).  Particularly when there is a prerequisite to a transaction, such as

3   signing up as a member, a reasonably prudent consumer would exercise a higher degree of care.

4   *Beyond the Rack*, No. C12-1387-TSZ at *26.  NoMoreRack requires all customers to sign up

5   with an email and password prior to making a purchase.  Further, while Nordstrom Rack and

6   NoMoreRack's prices are relatively inexpensive, the products themselves are brand name goods

7   typically found at higher prices.  The retailers are not selling inexpensive goods, but rather

8   quality goods at discounted prices.  Thus, a reasonably prudent consumer would exercise a

9   higher degree of care here and this factor weighs against likelihood of confusion.

10           g.  _Defendant's Intent in Selecting the Mark_

11          While intent to deceive consumers is not required, it is strong evidence of a likelihood of

12   confusion.  *Entrepreneur Media*, 279 F.3d at 1148 (internal citations omitted).  When the alleged

13   infringer knowingly adopts a mark similar to another's, the presumption is that the defendant can

14   accomplish the purpose of deceiving the public.  *Sleekcraft*, 599 F.2d at 354.  Nordstrom

15   contends that NoMoreRack adopted its marks with knowledge of their similarity to the Rack

16   marks.  Dkt. # 10 at 25.  Citing *Discovery Communications, Inc. v. Animal Planet, Inc.*,

17   Nordstrom argues that NoMoreRack acted in bad faith because it was on constructive and actual

18   notice of Nordstrom's rights to the Rack marks.  172 F.Supp.2d 1282, 1290 (C.D. Cal. 2001)

19   (finding there was willful intent to infringe where the defendant increased usage of the disputed

20   mark despite plaintiff's notice of unauthorized use and defendant's assurances it would cease

21   using the marks).  Despite receiving Nordstrom's cease and desist letters, NoMoreRack

22   continued to use its marks.  Ferron Dec. ¶ 5.

23          Absent further evidence, the Court declines to find that NoMoreRack intended to deceive

24   the public when selecting its mark.  First, the Court has determined RACK and THE RACK

occupy a crowded field of similar marks in the retail industry, so there is no indication that

NoMoreRack chose to incorporate "Rack" into its name in bad faith.  Second, it continued to use

NOMORERACK believing the marks did *not* infringe on Nordstrom's Rack marks.  *See*

Schneider Dec. ¶¶ 6-7.  The facts are distinguished from *Discovery Communications*, because

there the defendant acknowledged the unauthorized use of the infringing marks, but continued to

use them anyway, clearly evidencing bad faith.  There is nothing to suggest that NoMoreRack

acted in bad faith here.  This factor does not weigh in favor of likelihood of confusion.

> h.   *Likelihood of Expansion of Product Lines*

A "strong possibility" that either party may expand its business to compete with the other

weighs in favor of likelihood of confusion.  *Sleekcraft*, 599 F.2d at 354.  "When goods are

closely related, any expansion is likely to result in direct competition."  *Id.*  NoMoreRack does

not plan to go into a brick and mortar business, which would be in direct competition with

Nordstrom Rack.  Dkt. # 30 at 20.  At oral argument, Nordstrom indicated a possibility of

entering a hybrid flash sales business similar to NoMoreRack's model.  However, Nordstrom

provides no other evidence that it will take any significant steps to implement this business

within the course of this litigation.  Either way, this factor lends little weight to the overall

analysis, given that the parties are already competitors in the retail industry.

> i.   *Overall Analysis of the Sleekcraft Factors*

In sum, only two of the eight *Sleekcraft* factors weigh in favor of finding a likelihood of

confusion:  the strength of the NORDSTROM RACK mark and the proximity of the goods and

services offered by both parties.  After balancing the remaining factors, the Court finds there is

no likelihood of confusion present.  Thus, with the current evidence on record, Nordstrom likely

cannot prevail on the merits of its trademark infringement claim.

2.  <u>Dilution by Tarnishment</u>

To prevail on a trademark dilution claim under the Trademark Dilution Revision Act ("TDRA") of 2006, 15 U.S.C. § 1125(c), "a plaintiff must show that:  (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment."  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).  Likelihood of dilution may be found regardless of the presence of actual or likely confusion, competition or actual economic injury.  15 U.S.C. § 1125(c)(1); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264 (4th Cir. 2007).  Nordstrom does not argue a blurring claim, so only dilution by tarnishment will be discussed.

a.  *Famous and distinctive mark*

Under the TDRA, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the marks owner."  15 U.S.C. § 1125(c)(2)(A).  To determine the requisite degree of fame, the court may consider all relevant factors including:  (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume and geographic extent of sales or goods; (iii) the extent of the mark's actual recognition; (iv) whether the mark is registered.  *Id.*

Nordstrom Rack argues that its mark is famous and distinctive, because it is one of the leading fashion retailers in the U.S.  Since first opening in 1973, Nordstrom now operates 119 Nordstrom Rack stores in 27 states and the District of Columbia, grossing more than $2 billion in annual revenue.  Dkt. # 10 at 8-9.  In 1986, NORDSTROM RACK was registered on the USPTO's principal register where it continuously remains to this day.  *Id.* at 10.  For decades, public awareness of Nordstrom Rack has been fostered through paid and unpaid advertising

1  channels, including "direct mail, local newspaper ads, radio spots, billboards, and print articles"

2  as well as the recent shift to online advertising, email and social media.  *Id.*  NoMoreRack does

3  not dispute that NORDSTROM RACK is famous, and instead argues that RACK or THE RACK

4  standing alone is not famous "absent the NORDSTROM house mark."  Dkt. # 30 at 25; Dkt. #

5  62 at 14.  NoMoreRack in effect concedes to NORDSTROM RACK meeting the fame

6  requirement.  With this finding, combined with consideration of all the relevant factors,

7  Nordstrom has sufficiently demonstrated that NORDSTROM RACK meets the fame

8  requirement.  *See Nike, Inc. v. Nikepal Intern., Inc.*, No. 05-1468, 2007 WL 2782030, at *5-6

9  (E.D. Cal. Sept. 18, 2007) (finding NIKE famous because it "had spent in excess of a billion

10  dollars for promotion" in the U.S., it grossed least $1 billion in sales per year, it was recognized

11  for success by various publications, and registered on the principal register).

12      b.  *Defendant using mark in commerce*

13      To determine this prong, the Court must evaluate whether NoMoreRack's marks fall

14  within the definition of the statute.  The TDRA defines dilution by tarnishment as an "association

15  arising from the similarity between a mark or trade name and a famous mark that harms the

16  reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).  Thus the inquiry is twofold,

17  whether there is similarity between the marks at issue, and whether there is harm to the famous

18  mark's reputation.

19      As to "similarity" of the marks, courts formerly employed an "identical or nearly

20  identical" standard under the Federal Trademark Dilution Act ("FTDA") of 1995.[4]  *E.g. Playboy*

21  _____

22      [4] According to the FTDA:  "The owner of a famous mark shall be entitled, subject to the
principles of equity and upon such terms as the court deems reasonable, to an injunction against

23  another person's commercial use in commerce of a mark or trade name, if such use begins after
the mark has become famous and causes dilution of the distinctive quality of the mark. . . ."  15

24  U.S.C. § 1125(c)(1) (2005).

1    *Enterprises, Inc. v. Welles*, 279 F.3d 796, 806 (9th Cir. 2002) (establishing that in order for a

2    dilution claim to succeed, the mark used by the alleged diluter must be identical or nearly

3    identical to the protected mark).  However, when Congress enacted the TDRA, it replaced the

4    FTDA with a more detailed statute, notably providing relief for "likely" and not "actual"

5    dilution, as well as explicitly defining "blurring" and "tarnishment."  *Levi Strauss & Co. v.*

6    *Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1165-66 (9th Cir. 2011).  Under the new

7    "likelihood of dilution" standard, the Ninth Circuit ruled that in the blurring context, the plain

8    meaning of the TDRA no longer requires a plaintiff to "establish that the junior mark is identical,

9    nearly identical or substantially similar to the senior mark."  *Id.* at 1172.  The Court explained

10   that Congress specifically used the word "similarity" without joining adjectives that would

11   suggest a higher standard.  *Id.* at 1171.  Further, the blurring provision enumerates a non-

12   exhaustive list of factors to consider, in which "degree of similarity" is a listed factor.[5]  *Id.*  As

13   such, the Court reasoned that similarity between the marks is not a "necessarily controlling

14   factor" in the inquiry.  *Id.* at 1172.

15           Presumptively, the same standard applies in evaluating tarnishment claims.  Following

16   the Ninth Circuit's reasoning, the Court turns to the plain meaning of the statute.  *See U.S.*

17   *Aviation Underwriters, Inc. v. Nabtesco Corp.*, 697 F.3d 1092, 1096 (9th Cir. 2012) (finding

18   courts not only examine "the specific provision at issue, but also the structure of the statute as a

19   whole, including its object and policy").  In the broad sense, blurring and tarnishment are simply

20   _____

21           [5] The dilution by blurring provision provides that the court may consider all relevant
     factors, including:  (i) the degree of similarity between the mark or trade name and famous mark;
22   (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to
     which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv)
23   the degree of recognition of the famous mark; (v) whether the user of the mark or trade name
     intended to create an association with the famous mark; (vi) any actual association between the
24   mark or trade name and the famous mark.  15 U.S.C. § 1125(c)(2)(B).

1  two types of dilution, which are found under the same, overarching "likelihood of dilution"

2  standard.  The language construction of "similarity" is identical in both provisions.  *Compare* §

3  1125(c)(2)(B) (dilution by blurring is an "association arising from the similarity between a mark

4  or trade name and a famous mark. . ."), *with* § 1125(c)(2)(C) (dilution by tarnishment is an

5  "association arising from the similarity between a mark or trade name and a famous mark. . .").

6  Absent other words or indications in the statute to suggest a different standard for tarnishment,

7  the Court is convinced that the degree of similarity required is the same as blurring.

8          This leaves the issue of the enumerated factors found in blurring, but not tarnishment.

9  The Ninth Circuit reasoned that since "degree of similarity" is specifically enumerated in the

10  blurring provision, it lends further justification for the less stringent similarity standard.  The

11  factors listed are those relevant in determining whether the junior mark "impairs the

12  distinctiveness of the famous mark" as proscribed in the blurring definition.  15 U.S.C. §

13  1125(c)(2)(B).  This suggests that the factors, while relevant to the consideration of similarity,

14  are grounded in what is likely to cause blurring.  In other words, what makes the marks "similar"

15  for purposes of blurring is tied to evaluating a junior mark's likelihood of impairing a senior

16  mark based on those factors.  There are no similar factors listed for tarnishment, because what

17  "harms the reputation of the famous mark" is an entirely different inquiry.  Thus, the same

18  requirement of similarity applies for both blurring and tarnishment claims.

19          Here, the parties do not explicitly address the issue of similarity, rather relying on the

20  arguments made in the infringement context.  Nordstrom argues that the marks are similar in

21  sight, sound and meaning, therefore satisfying this low threshold requirement.  Dkt. # 37 at 11.

22  NoMoreRack relies on a conclusory assertion that mere association between the marks is not

23  enough to show similarity.  Dkt. # 62 at 14-15.  The considerations for determining similarity for

24

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 20

dilution have not been clearly defined.  However, the Court is persuaded that the factors of

appearance, sound and meaning, which are relevant in evaluating infringement, are also relevant

here.  The Court has already determined that taken in their entirety, NORDSTROM RACK and

NOMORERACK are not similar, because the shared characteristics in sound and stylization of

the "Rack" portions do not overcome the significant differences in overall appearance and

meaning.  Thus, NORDSTROM RACK and NOMORERACK are not sufficiently similar to

trigger protection under the dilution statute.  However, even assuming that Nordstrom satisfies

this element, the tarnishment argument would also fail in the harm requirement discussed below.

### c.  *Use of mark after it is famous*

Absent a showing of similarity between the marks, this factor is no longer a necessary

inquiry to the analysis.  However, since NoMoreRack does not address whether it used its marks

after NORDSTROM RACK achieved fame, it has effectively conceded this point.

### d.  *Likely to cause dilution by tarnishment*

This last prong focuses on whether the use of the junior mark "harms the reputation of the

famous mark."  15 U.S.C. § 1125(c)(2)(C).  Courts have found that harm "generally arises when

the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an

unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's

product."  *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111 (2d Cir. 2010) (quoting *Deere & Co.*

*v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)).  For example, there is some consensus

among courts across jurisdictions that a famous mark is tarnished when it is semantically

associated with a new mark used to sell sex-related products.  *See V Secret Catalogue, Inc. v.*

*Moseley*, 605 F.3d 382, 388 (6th Cir. 2010).  A trademark may also be diluted by tarnishment if

the mark loses its ability to serve as a "wholesome identifier" of the plaintiff's product.

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 110 (2d Cir. 2009) (citing *Hormel*

*Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996)).  The Second Circuit found that the relevant inquiry is how the junior mark's product affects the positive impressions about the famous mark's product, and not whether a consumer simply associates a negative-sounding junior mark with the famous mark.  *Starbucks*, 588 F.3d at 110.

In the present case, the Court must determine whether allegations of NoMoreRack's negative reputation, rises to the level of harm to Nordstrom Rack's reputation.  Nordstrom submits the following evidence of NoMoreRack's reputation:

1)  Better Business Bureau ("BBB") business review shows NoMoreRack's Vancouver office received 304 complaints beginning October 12, 2010, and NoMoreRack's New York business received 19 complaints beginning August 29, 2012.  Furey Dec. ¶¶ 6-7 (Dkt. # 21).

2)  Scambook.com lists 257 complaints about NoMoreRack from August 31, 2011 to November 19, 2012, with an estimated $120,228.84 in reported monetary damages.  *Id.* at ¶ 10.

3)  Sitejabber.com lists 240 reviews on NoMoreRack from December 15, 2010 to November 19, 2012, listing the company as "Not Recommended" with a rating of 1.5 stars.  *Id.* at ¶ 12.

4)  Complaintsboard.com lists 317 complaints against NoMoreRack as of November 19, 2012.  *Id.* at ¶ 14.

5)  The Daily Goodie Bag, an online blog, captured over 50 negative comments that were initially posted on NoMoreRack's Facebook page, which were subsequently deleted from Facebook.  Furey Supp. Dec. ¶¶ 4-5.

6)  Third party Facebook pages devoted to providing a forum for NoMoreRack complaints, including "Nomorerack Consumer Complaints and Hate Page."  *Id.* at ¶ 6-8.

7)  Since November 2012, the number of BBB complaints against NoMoreRack's Vancouver, New York and Delaware offices exceeds 1,500.  *Id.* at ¶ 10.

Nordstrom alleges that NoMoreRack's "shoddy service" is in the form of fraudulent credit card charges, undelivered goods, damaged goods and unfulfilled refunds.  Dkt. # 10 at 12-13.  Other complaints include email spam and counterfeit merchandise.  Furey Supp. Dec. ¶ 17.  It alleges

1   that NoMoreRack's reputation is further damaged through its affiliation with BidRack.com, a

2   website that gained notoriety as a penny auction scam.  Dkt. # 37 at 5.

3       NoMoreRack admits that in February 2011, it displayed an offer from BidRack on its

4   site, but denies any affiliation with the business.  Since April 2011, NoMoreRack has severed all

5   ties with BidRack.  Ash Dec. ¶¶ 27-29.  To counter Nordstrom's allegations of "shoddy service,"

6   NoMoreRack submits evidence of complaints lodged against Nordstrom on similar complaint

7   forums, arguing that websites specifically designed to perpetuate complaints have little value or

8   effect on the overall determination of a company's reputation.  *See* Cobb Dec. ¶¶ 5-13 (Dkt. #

9   31).  NoMoreRack further maintains that it has built a reputation for excellent customer service

10  and that about 80 percent of NoMoreRack customers are repeat buyers and referrals.  Dkt. # 30

11  at 9; *see* Ash Dec. ¶¶ 19-25.  NoMoreRack submits evidence of its "positive" reputation through

12  articles, customer reviews and social media examples.  *See* Winstead Dec. ¶¶ 3-7; Ash Dec. ¶ 26.

13      The Court is cognizant that there is no steadfast rule on whether an association resulting

14  from a company's "negative" reputation results in the type of "harm" embodied in the statute.  A

15  finding of harm is a fact-specific inquiry, and it is possible that the junior mark's overall negative

16  reputation could place the famous mark's product or service in a bad light.  *See Playmakers, LLC*

17  *v. ESPN, Inc.*, 297 F.Supp.2d 1277, 1285 (W.D. Wash. 2003) ("'Tarnishment' is a form of

18  dilution in which the junior user places the famous mark in a bad light, generally one that

19  involves sexual activity, obscenity, or illegal activity.").  The issue is whether the facts support a

20  threshold finding that NoMoreRack's reputation for "shoddy service" places Nordstrom Rack in

21  a bad light.  The Court finds that it does not.

22      Considerations such as complaints, reduction in sales, loss of customers, and negative

23  press are all relevant to the overall determination.  In this case, Nordstrom only provides

24

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 23

1  evidence of complaints against NoMoreRack to demonstrate its negative reputation.  The

2  majority of complaints are from anonymous Internet users that have posted on various blogs and

3  forums online.  Sites such as Sitejabber, Complaintsboard and Scambook are designed to

4  facilitate negative feedback from disgruntled customers or even competitors, who can write

5  multiple reviews across multiple forums.  The evidence is not persuasive because there is no

6  discerning whether the number of complaints actually correlates with the business' overall

7  reputation.  BBB complaints, while a little more credible, must be evaluated in light of all other

8  considerations.  NoMoreRack, on the other hand, provides evidence of positive reviews,

9  increased growth and sales figures, and positive articles to rebut Nordstrom's argument.  Upon

10 balancing the evidence of both negative and positive associations, the facts are insufficient to

11 show that NoMoreRack has a shoddy reputation.  Thus, the use of NOMORERACK is not likely

12 to cause dilution by tarnishment to NORDSTROM RACK.

**C.  Irreparable Harm**

14        In light of Nordstrom's improbability of success on the merits of both the infringement

15 and dilution by tarnishment claims, the Court need not address the remaining prerequisites, but

16 will do so to discuss separate bases for denial of the injunction.  Trademark infringement

17 constitutes an intangible injury in the form of loss of control of a business' reputation, a loss of

18 trade, and loss of goodwill.  *See Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187,

19 195 (3rd Cir.1990). *See also Apple Computer, Inc. v. Formula Int'l Inc.,* 725 F.2d 521, 526 (9th

20 Cir.1984).  The presumption of irreparable harm in the trademark context appears to survive,

21 because where a plaintiff is likely to succeed on the merits of a trademark infringement claim, he

22 necessarily is likely to suffer irreparable harm.  *See Marlyn Nutraceuticals, Inc. v. Mucos*

23 *Pharma GmbH & Co.,* 571 F.3d 873, 877 (9th Cir.2009) (upholding the district court's

24 application of the presumption of irreparable harm in a trademark infringement case following

1    *Winter*).  Further, a finding of likely dilution by tarnishment is a separate basis for injunctive

2    relief proscribed in the statute.  *See* 15 U.S.C. § 1125(c)(1).  Nordstrom, having assumed that the

3    Court would reach the opposite conclusion offers little proof on the irreparable harm it would

4    suffer absent the injunction.  Nordstrom simply argues that proof of actual confusion and

5    tarnishment of its Rack marks is sufficient to warrant a finding of irreparable harm.  Dkt. # 37 at

6    15.  Having concluded that Nordstrom did not make a substantial showing in either case, the

7    argument fails.

8    **D.  Balance of Hardships**

9           While Nordstrom likely cannot prevail on either claim, it has not raised serious questions

10   going to the merits either.  Even so, the balance of hardships must tip "sharply" in its favor.

11   Nordstrom argues there is little hardship to NoMoreRack, because it only needs to discontinue

12   the use of its marks pending trial, resulting in no harm.  Dkt. # 10 at 29.  NoMoreRack alleges it

13   would incur "substantial losses in revenue, inconvenience its customers and potential customers,

14   and lose half of its workforce" if the injunction issues.  Dkt. # 30 at 28.  It would also disrupt

15   relations with its suppliers and incur significant costs in re-branding, resulting in roughly $20

16   million in losses per month.  Ash Dec. ¶¶ 30-31. Given the substantial losses NoMoreRack will

17   likely incur, the balance of hardships does not tip sharply in Nordstrom's favor.

18   **E.  Public Interest**

19          Enforcement of trademark rights typically serves the public interest.  *See State of Idaho*

20   *Potato Comm'n v. G&T Terminal Packaging, Inc.,* 425 F.3d 708, 715 (9th Cir. 2005)

21   ("Trademarks protect the public from confusion by accurately indicating the source of the

22   product.  They preserve a producer's good will in order that the purchasing public may not be

23   enticed into buying A's product when it wants B's product.") (internal citations omitted).  Thus,

24   the public interest factor weighs in favor of Nordstrom.

**F.  Overall Analysis**

For the reasons stated above, Nordstrom likely cannot prevail on the merits of either the trademark infringement or dilution by tarnishment claims.  Further, even if Nordstrom had raised serious questions going to the merits, it fails to demonstrate a likelihood of both irreparable harm and that the balance of equities tips sharply in its favor.  Accordingly, the Court declines to grant the extraordinary remedy of a preliminary injunction at this time and DENIES Nordstrom's motion.

**IV.  CONCLUSION**

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, oral arguments, and the remainder of the record, the Court hereby finds and ORDERS that Plaintiffs' Motion for Preliminary Injunction (Dkt. # 10) is DENIED.

Dated this 25 day of March 2013.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE